THE INTERNATIONAL SILVER COMPANY

*v.*

WILLIAM H. ROGERS CORPORATION.

[Filed February 9th, 1904.]

1. A man has no right to pass off his goods as the goods of a rival trader.

2. The name of a person may become so far associated with the goods of a particular maker, that its use without explanation or qualification by another may deceive a purchaser into the belief that he is getting the goods of A. when he is really getting the goods of B. If the proof be not merely that the trader is using a particular name to designate his goods, but that he is using it in such manner as to put off his goods as the goods of his rival, that rival is entitled to restrain him from using it in that way.

3. The rule of law is the same where a corporation takes or imitates the name of a rival trader. It may, as a matter of evidence, be easier to infer the fraudulent intent or false representation, but such intent or representation must still be made out.

4. Proof of fraudulent intent is not essential. If a representation, false in fact, though ignorantly or innocently or mistakenly made, be shown, the plaintiff is entitled to relief by way of injunction. The action of the court depends upon the right of the plaintiff and the injury to that right, not upon the motive of the defendant.

On final hearing.

*Mr. Edward A. Day, Mr. Hiram R. Mills* (of the Connecticut bar), and *Mr. John P. Bartlett* (of the New York bar), for the complainant.

*Mr. Craig A. Marsh,* for the defendant.

STEVENS, V. C.

This is a suit to enjoin the defendant corporation from selling or disposing of silver-plated spoons, forks or knives, or other silver-plated tableware stamped with the mark "Wm. H. Rogers," or "William H. Rogers," or "Wm. H. Rogers Corporation," or any other mark of which the words "Wm. Rogers" are a characteristic part, and from applying any such mark to the boxes, wrappings or labels containing them.

The complainant is the successor of several companies which have been engaged for many years in the manufacture of silver-plated ware, and which all derive their title from three brothers of the name of Rogers, who were among the first, if not the first, to apply the art of electro-plating to its manufacture. They gained a reputation for their products, and the name "Rogers" has acquired a secondary significance in connection therewith. It has been so often decided, in cases which will be referred to in the course of this opinion, that the complainant and its immediate predecessors are entitled to the trade names Wm. Rogers & Sons, Wm. Rogers and Wm. Rogers Manufacturing Company, that any further statement of complainant's title or the grounds on which it rests is needless.

The facts are as follows: William Henry Rogers, a machinist by trade, began the business of repairing bicycles in the year 1890, at Plainfield, New Jersey. That business declining, he

looked about, as he says, for something else. In August, 1898, he formed a partnership with Joseph A. Hubbard, a tax assessor, who agreed to advance $3,000 with which to commence the silver-plated ware business. Rogers, who had no money, was to put his time against Hubbard's capital, and the profits were to be equally divided. He had had no experience in this business and took no steps to qualify himself to conduct it, except, as he says, to talk with a jobber in New York, and some jewelers in Plainfield; to visit some of the department stores, to converse with the salesmen there and to read catalogues and advertisements. He had no knowledge, practical or theoretical, of the process of electrotyping and he took no steps to acquire it. Among the catalogues he read were those of the William Rogers Manufacturing Company. With this preparation, he went to the factory of the Bristol Brass and Clock Company, in Connecticut. He selected patterns for spoons and forks, and arranged with the company to make and box them, and stamp them with the name "Wm. H. Rogers Co." During the continuance of the partnership, which lasted from August, 1898, to August, 1899, he obtained from them, and from the Silver Plate Cutlery Company, goods which cost in all from $5,000 to $6,000. These he sold mostly at wholesale, and at slight, if any, profit. Shortly after the dissolution of the partnership he entered into a written contract with the M. S. Benedict Manufacturing Company, of Syracuse, a large concern, also engaged in the business of manufacturing and selling plated ware. Under this contract he sold to that company the greater part of all the goods which the Bristol and other companies were making for him. From August, 1899, to August, 1900, they amounted in value to about $30,000, and were stamped with the name "Wm. H. Rogers."

In May, 1900, the International Silver Company commenced an action in the superior court of Connecticut to restrain the Bristol Brass and Clock Company from stamping the words "Wm. H. Rogers" or "Wm. H. Rogers Co." on spoons, forks and knives. The clock company answered. Although Rogers was not made a party, he was examined on commission at Plain-

field, on July 26th, 1900. On this examination most of the facts already stated were disclosed and thereafter the Bristol company ceased to manufacture for him, and entered into a stipulation with complainant not to do so. In November, 1900, complainant brought suit in the United States circuit court for the northern district of New York against the M. S. Benedict company. It did not defend the action, and on February 1st, 1901, an injunction issued restraining the use in connection with silver-plated ware, procured by William H. Rogers, of the abbreviation "Wm." or the initial "W." in combination with the word "Rogers."

What amount of ware W. H. Rogers procured to be manufactured for him after July, 1900, and prior to the formation, on April 30th, 1901, of the William H. Rogers Corporation, does not appear. Rogers' testimony throughout is vague—vaguer, perhaps, than might have been expected, even though he was unable to refer to his books, which he says were destroyed by fire in 1901. The probability is that his principal manufacturer having ceased to make goods for him, and his principal customer having been enjoined, the amount which he caused to be manufactured between August, 1900, and May, 1901, was very small. On the organization of the William H. Rogers Corporation, he received for his business twelve shares of stock and $700 in cash, and this, by the terms of the written transfer, included not only his stock of knives, forks and spoons, but also his toilet sets, picture frames, clocks and fancy ornaments; two wall cases and two cabinets, as well as the unexpired lease, the good will and the trade mark of the vendor. In his evidence he says that the good will and registered trade mark were valued at $1,200, and so everything else was considered to be worth $700. The trade mark referred to in the transfer had been registered with the secretary of state on June 21st, 1900. It did not include the name "Rogers." It consisted only of a red seal with the letter "R" in white, in the middle, and underneath the words "trade mark."

The subscribers to the corporate stock were William H. Rogers, forty-eight shares; Eugenia L. Babcock, thirty shares; Joseph

A. Hubbard, five shares; Howard P. Reynolds, five shares, and John P. Mosher, one share. From this time on, the business seems to have prospered. After the corporation was formed (April 30th, 1901), a change took place in its conduct. Before that time everything, including the wrapping, boxing and stamping of the name "Wm. H. Rogers," with or without the seal, had been done by the manufacturer. After that time the spoons and forks came, plated and burnished, in packages containing half a dozen gross. These the Rogers corporation buffed, inspected, wrapped (six spoons in a package) and put in boxes, labeled. The knives sold were as before—because it was necessary to etch the name—completely finished by the manufacturer.

The question presented is this: (1) Shall the defendant corporation be enjoined from using its corporate name in its business? (2) Shall it be enjoined from stamping or etching that name on its plated ware? (3) Shall it be enjoined from using the words "Wm. H. Rogers" on its ware or otherwise, or from using any words of which "Wm. Rogers" are a characteristic part?

The precise point involved, while it has been the subject of repeated discussions elsewhere, does not appear to have been decided by this court. I may be pardoned, therefore, if I refer to the authorities at length, and more especially as they appear to be, in some respects, conflicting, and as the subject itself is one of considerable and increasing importance. The leading case is *Croft* v. *Day, 7 Beav. 88.* It there appeared that a blacking manufactory had long been carried on under the name of Day & Martin, and that a person of the name Day, having obtained the authority of a man by the name of Martin to use his name, set up the same trade in the same neighborhood, and sold blacking in bottles and with labels having a general resemblance to those of the original firm. He was restrained from doing so. Lord Cranworth said: "He [Day] has a right to carry on the business of a blacking manufacturer honestly and fairly. He has a right to the use of his own name. I will not do anything to debar him from the use of that or any other name calculated to benefit himself in any honest way, but I must

prevent him from using it in such a way as to deceive and defraud the public, and obtain for himself, at the expense of the plaintiffs, an undue and improper advantage." He thus stated the principal applicable to the case: "No man has a right to sell his own goods as the goods of another. You may express the same principle in a different form and say that no man has a right to dress himself in colors or adopt or bear symbols to which he has no exclusive or peculiar right, and thereby personate another person for the purpose of inducing the public to suppose either that he is that other person or that he is connected with or selling the manufacture of such other person, while he is really selling his own."

This case was followed by *Burgess* v. *Burgess, 3 De G., M. & G. 896.* A father had for many years sold, exclusively, an article under the name of "Burgess' Essence of Anchovies." He took his son into partnership with him and they, until the father's death, and the son afterwards, continued to carry on the business in the name of John Burgess & Son. A son of this son, William H. Burgess, had for many years been employed in their business. He went off by himself, and, under the name of W. H. Burgess, started a similar business on his own account, and advertised and made a sauce which he also called "Burgess' Essence of Anchovies." The lord-justices, on appeal, refused to enjoin him, although he had been enjoined from doing certain other things by the vice-chancellor. The epigrammatic judgment of Lord-Justice Knight Bruce has often been criticised, but that of Lord-Justice Turner has been regarded as an accurate exposition of the law. He said: "No man can have any right to represent his goods as the goods of another person, but in applications of this kind it must be made out that the defendant is selling his own goods as the goods of another. Where a person is selling goods under a particular name and another person not having that name is using it, it may be presumed that he so uses it to represent the goods sold by himself as the goods of the person whose name he uses. But when the defendant sells goods under his own name, and it happens that the plaintiff has the same name, it does not follow

that the defendant is selling his goods as the goods of the plaintiff. *It is a question of evidence in each case whether there is false representation or not.*" He thought that under the evidence there was *then* no such representation. The report shows that the plaintiff was making "Burgess' Essence of Anchovies" under the firm name of John Burgess & Son, while the defendant was making a similar essence under the name of W. H. Burgess.

Of this judgment, Lord-Justice James, in the subsequent case of *Massam* v. *Thorley's Cattle Food Co., 14 Ch. Div. 748, 753,* said "that I take to be an accurate statement of the law and to have been adopted by the house of lords in *Wortherspoon* v. *Currie.*" He said, further: "Now, *Burgess* v. *Burgess* has been very much misunderstood, if it has been understood to decide that anybody can always use his own name as a description of an article, whatever may be the consequence of it, or whatever may be the motive for doing it or whatever may be the result of it."

"The fundamental rule," said Lord Kingsdon, in another case often cited (*Leather Cloth Co.* v. *American Leather Cloth Co., 11 H. L. Cas. 537*), is that one man has no right to put off his goods for sale as the goods of a rival trader, and he cannot, therefore, in the language of Lord Langdale, in *Perry* v. *Truefitt,* be allowed to use names, marks, letters or other *indicia* by which he may induce purchasers to believe that the goods which he is selling are the manufacture of another person."

One of the most recent cases in the house of lords is *Reddaway* v. *Banham, L. R. App. Cas. 199 (1896),* which contains, especially in the lucid judgment of Lord Herschell, a thorough discussion of the principle which obtains in cases of this class. Lord Halsbury summed up the matter thus: "For myself, I believe the principle of law may be very plainly stated, and that is that nobody has any right to represent his goods as the goods of somebody else." And Lord Herschell said: "The name of a person, or words forming part of the common stock of language, may become so far associated with the goods of a particular maker that it is capable of proof that the use of them by themselves without explanation or qualification by another manufacturer

would deceive a purchaser into the belief that he was getting the goods of A. when he was really getting the goods of B. In a case of this description the mere proof by the plaintiff that the defendant was using a name, word or device which he had adopted to distinguish his goods would not entitle him to any relief. He could only obtain it by proving further that the defendant was using it under such circumstances or in such manner as to put off his goods as the goods of the plaintiff. If he could succeed in proving this, I think he would, on well-established principles, be entitled to an injunction."

This, I think, is a very accurate expression of the law as it is laid down in the most recent and the most authoritative decisions· in this country. *American Wallham Watch Co.* v. *United States Watch Co., 173 Mass. 85; C. S. Higgins Co.* v. *Higgins Soap Co., 144 N. Y. 462; Singer Manufacturing Co.* v. *June Manufacturing Co., 163 U. S. 169.* On *p. 188* of the last-cited case Mr. Justice White says: "Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied by any precaution or indication, *in itself* amounts to an artifice calculated to produce the deception alluded to in the foregoing adjudications."

I have thus far referred to cases in which the court was considering the right of a man to use his own name. While that right is fully recognized, it is said, in the later cases especially, and they are numerous, that it is the duty of the court to restrain a man from so using his name on or in connection with his own goods (if that name has come to be recognized as characterizing a rival trader's goods) as to suggest that those goods are his rival's goods and to pass them off as such. *Valentine Meat Juice Co.* v. *Valentine Extract Co., 17 Rep. Pat. Cas. 673.*

The principle applied in the case of names of persons is the same that obtains where the right to use geographical names, or names descriptive of the quality or composition of an article comes in question. It is open to everyone to tell where he carries on his manufacture; it is open to everyone to say what his wares are made of; but here, too, he must do it in such a way as not to produce deception. Thus in *Wortherspoon* v. *Currie,*

*L. R. 5 H. L. 508,* Currie was enjoined from using the geographical name "Glenfield" in connection with the starch manufactured by him in that village. It was contended that the defendant, in describing it as made there, only told the simple truth, but the house of lords said that the mere fact that he was really carrying on his manufacture at Glenfield, and that he was, therefore, in a misleading sense, stating what was so, did not relieve him from the charge that his proceedings were intended to produce, and calculated to produce in the mind of purchasers, the belief that his article was the article of the plaintiff. The fallacy, as was said in a subsequent case, lay in overlooking the fact that a word may acquire in a trade a secondary significance, differing from its primary one, and that if it is used to persons in the trade who will understand it and be known as intended to understand it in its secondary sense, it will be none the less a falsehood that in its primary sense it may be true.

*Montgomery* v. *Thompson, L. R. App. Cas. 217 (1891),* is another striking case. The plaintiff and his predecessors had for upwards of a century carried on the business of a brewer, at Stone. Their ales had gained a high reputation under the name of "Stone Ale." The defendant, who had just begun to manufacture ale in the same place, was restrained from calling his ale "Stone Ale," because it was apparent that he was selling his ale under that designation in order to deceive the public into the belief that they were obtaining the plaintiff's ale. It was distinctly said in one of the judgments that the defendant was entitled to brew ale at Stone, and to indicate that it was manufactured there, but, it was remarked, there were various means of stating that fact without using the particular collocation of words that had, by long usage, become the designation of the plaintiff's ale.

In the case of *Reddaway* v. *Banham, L. R. App. Cas. 199 (1896),* already quoted, the defendant was enjoined from using the descriptive words "Camel's Hair" in connection with belting, although it was conceded that the defendant's belting was made of camel's hair. The decision was put upon the ground that

the jury had found that those words had acquired a secondary meaning in the trade, and that they did *not* convey to persons dealing in belting the idea that it was made of camel's hair, but the idea that it was belting of the manufacture of the plaintiff.

The cases above cited sufficiently illustrate the trend of decision on the subject. They are all cases in which the defendant was in one sense, but in a misleading sense, telling the simple truth.

It was argued, on behalf of the complainant, that while a man might use his own name in any business, if he used it fairly, he could not give it to a corporation if it was also the name of a rival trader and had acquired a peculiar significance in connection with that trader's business. No such rule is fairly deducible from the cases. The question being whether there was a false representation, it might in many cases be easier to infer such representation, as a matter of evidence, as a fact, where a corporation had without propriety assumed the name of a rival, than it would be to infer it where an individual of the same name came into competition with him; because, as has been often said, the whole vocabulary of names is open to those who organize a new company, while the individual is not responsible for his name and ought, ordinarily, in common honesty, to use it and do business under it. Still, the matter would be one of evidence and not of law. This distinction is illustrated by the two cases of the *International Silver Co.* v. *Simeon L. & George H. Rogers Co., 110 Fed. Rep. 957,* and *Baker* v. *Baker, 115 Fed. Rep. 297.* In the first case, it appeared that, although Simeon and George Rogers were sons of the original Rogers' Brothers, neither of them had ever engaged in the manufacture of plated ware, and their connection with the company was due solely to their name. The company was enjoined from using the words "Rogers Bros." or "Rogers" on its ware. In the second case, one Baker had done business under the name "Wm. H. Baker, Syracuse, N. Y." He subsequently organized a corporation with precisely the same name, and the circuit court of appeals held that, so far as the complainant was concerned, it was quite immaterial whether he did business in that name as a corporation

or in that name as an individual; that as he might have done business in the latter so he might in the former. In the latter case, as in the former, the question of fact to be determined was whether the corporate name contained a *suggestio falsi.* It was evident that in the latter case it did not, for the individual and the corporate name were in every respect identical and their effect upon the public would necessarily be the same.

I now come to a question as to which there seems to have been considerable contrariety of judicial opinion. Is it necessary to prove fraudulent intent? Must it be shown not only that the representation is false in fact, but that it is intentionally false? Some *dicta,* especially in the earlier cases, do go the length of so asserting, but the weight of judicial opinion is the other way. In some of the cases confusion may have resulted from a failure to distinguish between the legal and the equitable rule on the subject of false representation. "In an action of deceit to recover damages," says Justice Depue, in *Cowley* v. *Smyth, 17 Vr. 382,* "a false representation without a fraudulent design is insufficient. There must be moral fraud in the misrepresentation to support the action." The rule, as he pointed out, is different in equity. *Eibel* v. *Von Fell, 10 Dick. Ch. Rep. 670,* is to the same effect. Lord Cairns, in *Singer Machine Manufacturing Co.* v. *Wilson, 3 App. Cas. 392,* adverts to this subject. He said: "In *Millington* v. *Fox, 3 Myl. & C. 338,* Lord Cottenham felt satisfied that in using the plaintiffs' trade marks the defendants had no intention to mislead the public, yet inasmuch as the public were in fact misled he held that the plaintiffs were entitled to a perpetual injunction. It was not sufficient for the defendants to say that they used the marks in ignorance of their being the plaintiffs' trade marks. How far that doctrine is capable of being reconciled with cases at law in which the *scienter* has been held to be essential in order to enable the plaintiff to recover (that is, to recover damages), it is not material to consider. In this court, the rule is clear as laid down in *Millington* v. *Fox."*

In the subsequent case of *Singer Manufacturing Co.* v. *Loog, 8 App. Cas. 15, 31,* Lord Blackburn seems to have doubted whether, even at law, in trade mark cases, it was necessary to

show actual fraudulent intention. And in *Miller Tobacco Co.
v. Commerce, 16 Vr. 23*—a trade mark case—it was held by
our supreme court that proof of intentional fraud was not
essential. "The injury is complete," said Justice Knapp, "if
the same label or mark is used which recommended the article
to the public by the established reputation of another." The
cases in equity in this state, so far as reported, are either cases
in which there was a fraudulent imitation of complainant's trade
mark or label (*Wirtz* v. *Eagle Bottling Co., 5 Dick. Ch. Rep.
164; Centaur Company* v. *Link, 17 Dick. Ch. Rep. 148*) or a
fraudulent appropriation of a fancy name. *Van Horn* v. *Coogan,
7 Dick. Ch. Rep. 380.* In the *Wirtz Case,* Vice-Chancellor
Van Fleet held that on the assumption that the defendant's
acts were innocent, the complainant was entitled to relief. "The
vital question," he remarked, "is not what did the defendant
mean, but what has he done? It is no less a dictate of justice
than of sound reason that every person must be understood to
have intended to do just what is the natural consequence of his
acts deliberately done. The aggrieved person in cases of this
class is not required to show intentional fraud, but he makes a
sufficient case to give him a right to protection when he shows
that the defendant is using his label, or one so nearly like it as
to render deception of the public and injury to himself probable."

Lord Blackburn thus expressed himself in *Singer Manu-
facturers* v. *Wilson, 3 App. Cas. 376, 391:* "A man may take
the trade mark of another ignorantly, not knowing it was the
trade mark of the other, or he may take it in the belief, mis-
takenly but sincerely entertained, that in the manner in which
he is taking it he is within the law and doing nothing which the
law forbids, or he may take it knowing that it is the trade mark
of his neighbor, and intending and desiring to injure his neigh-
bor by so doing; but in all these cases it is the same act that is
done, and in all these cases the injury to the plaintiff is just
the same. The action of the court must depend upon the right
of the plaintiff and the injury done to that right. What the
motive of the defendant may be the court has very imperfect
means of knowing. If he was ignorant of the plaintiff's rights

in the first instance, he is, as soon as he becomes acquainted with them, and perseveres in infringing upon them, as culpable as if he had originally known them."

In the subsequent case of *Singer Manufacturing Co.* v. *Loog, 8 App. Cas. 15, 31*, the same distinguished judge points out that where the act was, in the first instance, done innocently, a claim at law for damages would not be maintained; but if persevered in, after knowledge of the facts, there would be evidence to support a legal demand for knowingly selling the defendant's goods as and for the plaintiff's. The same principle would apply to the case of an accounting in equity.

That this rule is not confined to copies or imitations of trade marks, appears from the following cases: *Higgins Company* v. *Higgins Soap Co., 144 N. Y. 462; Wyckoff, Seamans & Benedict* v. *Howe Scale Co., 110 Fed. Rep. 520; Hendriks* v. *Montagu, 17 Ch. Div. 638; North Cheshire and Manchester Brewery Co.* v. *Manchester Brewery Co., L. R. App. Cas. 83 (1899)*. In the last case, which is particularly pertinent because it involved the taking of a corporate name, Lord Halsbury thus expressed himself: "In the result it is perfectly immaterial, to my mind, for the purpose of the decision, whether they [the company] were fraudulent or not. The question is whether this (that is, the assumption of the name Cheshire and Manchester Brewery Company) is an injury to the plaintiff's right. If it is an injury to the plaintiff's right, it is perfectly immaterial whether they intended it or not. The court must restrain them from doing that which is an injury to another person, however inadvertently they may have done it."

I will now refer to two or three of the more important cases on which defendant's counsel relied. The first is *Lawrence Manufacturing Co.* v. *Tennessee Manufacturing Co., 138 U. S. 537*, where Chief-Justice Fuller said: "The deceitful representation or perfidious dealing must be made out or be clearly inferable from the circumstances." He concluded by saying: "There is no proof justifying the inference of fraudulent intent or of deception practiced on the plaintiff or on the public." He was not considering the precise question now

under consideration, and if the case is an authority either way it rather accords with the view I have taken, for the defendant may ignorantly or innocently do that which deceives the public and injures the plaintiff. It is this kind of deception which in the passage cited is, I have no doubt, contrasted with the wrong-doing which is called "perfidious dealing," and which involves moral guilt. In the passage quoted by counsel from Mr. Justice Field, in *Goodyear Rubber Manufacturing Co.* v. *Goodyear Rubber Co., 128 U. S. 604,* the illegal act is made to consist only in a representation, false in fact, which is injurious to the plaintiff. "The case at bar," says that judge, "cannot be sustained as one to restrain unfair trade. Relief in such cases is granted only where the defendant, by his marks, signs, labels or in other ways represents to the public that the goods sold by him are those manufactured or produced by plaintiff, thus palming off his goods for those of a different manufacturer, to the injury of the plaintiff."

In the subsequent case of *Singer Manufacturing Co.* v. *June Manufacturing Co., 163 U. S. 169,* the defendant no doubt honestly thought that he was acting within his right, but he was restrained from using a name that had become common property in such a way as to deceive. The language of Mr. Justice White is: "He cannot resort to any artifice or *do any act* calculated to mislead the public," &c. And, again: "The use of such name by another, unaccompanied with any precaution or indication, *in itself* amounts to an artifice calculated to produce the deception alluded to in the foregoing adjudications."

Another case is *Rogers et al.* v. *Rogers et al., 53 Conn. 121.* As I read that case it stands on all fours with such cases as *Turton* v. *Turton, 42 Ch. Div. 128.* The superior court by their finding of fact, which bound the court of review, negatived the intent to defraud, and also negatived the allegation that the defendant's stamp was not only calculated to mislead and deceive, but that it did mislead and deceive purchasers and induce them to buy defendant's goods, supposing them to be of plaintiff's manufacture.

The court above, being bound by this finding, which was one of fact, it appeared that a representation false in fact and injurious to plaintiff had *not* been made. The only point decided was that a man might use his own name, if he used it with proper distinguishing marks. Thus regarded, the case is in line with the latest decisions. The same comment may be made upon the subsequent case of *William Rogers Manufacturing Co.* v. *Simpson, 54 Conn. 527.*

In the light of the above adjudications, I will now recur to the facts. William Henry Rogers, as I have said, was a machinist by trade, who had, up to 1898, been engaged in the bicycle business. He was not familiar with electro-plating, and he had had no experience in manufacturing or selling silver plate. He had only qualified himself to enter the business by reading catalogues, and, among others, the Rogers' catalogues; by talking with salesmen at the counters of department and other stores, and with a jobber named Johnson. With this slender qualification, he went to the Bristol Brass and Clock Company and contracted with them for spoons and forks, which were to be stamped with the name "Wm. H. Rogers Co." He conducted the business in this way, and on a very small scale, for a year. Then the partnership having been dissolved, he did nothing more for several months. After that he entered into a written contract with the M. S. Benedict company, a responsible concern, with an extensive business of the same character. The terms of this contract, so far as shown (for the contract is not produced), are very significant. Rogers was, upon the order of the Benedict company, to order goods of the manufacturer, stamped "Wm. H. Rogers," and the Benedict company was to purchase them from him for a price in excess of the price which he was to pay the manufacturer. The manufacturer was to ship the goods directly to the Benedict company, and so, in the result, Rogers had nothing whatever to do with them, except to order them and to accept the agreed price. This price, in the case of knives, was an advance of five cents per dozen over the manufacturer's price. What it was in the case of forks and spoons, Rogers does not remember.

Up to this time the "Wm. H. Rogers Corporation" had not been formed. I shall stop to consider what, just before its formation, was Rogers' position? The law is that a man may carry on business under his own name, and may compete under that name with any other person engaged in the same or a similar business. The law favors competition and none the less because it may be carried on by a competitor bearing the same name. What it does, and all that it does, is to prevent the passing off by one man of his goods as the goods of someone else, to the injury of the latter. Had Rogers been seeking to so pass off his goods? It is evident that he had been, and that, at this period at least, he was seeking to appropriate to himself the reputation and trade of another. He did not give to his firm the name "Rogers & Hubbard," although Hubbard had furnished all the capital; he had called it the "Wm. H. Rogers Co." The name adopted was strikingly like the name that he knew—that he had seen in the Rogers catalogue—"Wm. Rogers Manufacturing Co." Although counsel's attention was directed to the subject, for he took the trouble to prove that on one occasion, several years ago, Rogers had signed his name "Wm. H. Rogers" in a savings bank registry, he did not prove how he had on other occasions designated or subscribed himself, or how he had styled himself in the bicycle business. I must therefore assume that he did not employ the abbreviation "Wm." Then why did he adopt it at this time if not to suggest to the public that his business was in some way connected with that of the New England manufacturers, who had always used that abbreviation; and why, too, did he adopt a partnership name so unusual in itself (Wm. H. Rogers Co., not Wm. H. Rogers & Co.) if not to simulate the name of the New England company?

Is it not certain that he must have thought that the name in this form would of itself, and from the very beginning, have a pecuniary value? To whom did that value belong? Certainly not to himself. So much for his original intent. When the partnership was dissolved, he stamped upon his ware the name "Wm. H. Rogers," without any accompanying mark. Why did he still retain the abbreviation "Wm.?" Why did he, at this

stage of his business, stamp his name upon plated ware at all? It is proved that the name stamped upon forks, spoons and knives does not necessarily indicate the manufacturer. It may be that of the jobber or retail dealer. But was he really at that time either? Is it not plain that the contract between himself and the Benedict company was, on the face of it, a mere contrivance to appropriate for the benefit of the Benedict company and of Rogers himself some of the reputation and profit which properly belonged to another? The Benedict company was a concern manufacturing on its own account. It could have stamped its own name upon the goods which it manufactured, or had manufactured for it; but it seems to have thought that it might prove profitable to sell plated ware under the name "Rogers." To call the transaction, as it is disclosed by the proofs, a genuine sale by Rogers, in the character of a jobber, to the Benedict company, in the character of a retail dealer, is absurd. The name stamped, regarded as the name of William H. Rogers, neither was nor could have been, at that time, a guarantee of excellence or of anything else which the purchasing public would consider valuable. He had no skill, no reputation in the market as a dealer in plated ware, no financial responsibility. And yet the Benedict company were willing to pay him five cents per dozen for knives stamped with his name. This payment could, in the nature of things, have only represented the value of the name and reputation of the predecessors of complainant. Rogers swears very positively that the Benedict company was the out-and-out purchaser of his goods and not the selling agent. If this were so, then they practiced another imposition upon the public, for the Benedict catalogues, with which Rogers was familiar, contained the representation that the Benedict company was Rogers' agent.

Aside, then, from the rule requiring distinguishing marks, I think the conclusion is inevitable that up to, or nearly up to, the time of the formation of the Rogers corporation, Rogers was using the name to gain for himself a profit which belonged to another. He was consciously seeking to pass off his goods as the goods of his competitor.

After he formed the William H. Rogers corporation he was acting under advice of counsel, and he, no doubt, thought that he was within his legal rights. But, as I have endeavored to show, that of itself will not legalize his acts. As one of the original subscribers to the corporate stock he took forty-eight shares. Mrs. Babcock took thirty shares and Mr. Hubbard took five shares. By this time, at least, it must have been clear that objection would be made to the use of the words "Wm. Rogers." The two suits brought against those with whom he dealt made that plain. The whole vocabulary of names lay open to them. They might have taken a name descriptive of the place of manufacture; of the kind of goods they expected to deal in; of the principal persons connected with the corporation; they might have taken a fancy name. What they did was to take the name "Wm. H. Rogers Corporation." They did it, as they say, because William H. Rogers was to become its president and manager and was to transfer to it his business and good will. Now, as far as the stock was concerned, it was insignificant in amount; and as to the good will, there was none except that acquired by fraud. His name itself could have added little or nothing to the success of the enterprise except in so far as it suggested the name and reputation of his competitor.

I have already said that a man is not always debarred from giving his own name to a corporation, where it happens to be the name of a competitor, if he does it for some good reason and in such a way as not to mislead the public. His name may be valuable to him because it suggests *his* skill, or *his* financial ability, or something else which belongs to *him*. That was the position of W. H. Baker, in the case already cited. If it only suggests the skill or ability of another, its adoption as a corporate name is a species of deception—a false representation— which the law will not countenance. In this case there was no valid reason why the individual name should have been adopted as the corporate name. It was not only embodied in that name, but embodied in the most objectionable form—with "William" abbreviated. For this, as I have said, so far as the evidence shows, there was no excuse. The corporators say that

they used every effort to distinguish the name which they adopted from the trade name of complainant. In an undertaking apparently so easy, one would have expected a greater degree of success. If they regarded the word "Rogers" as essential, they might have called the company the Rogers–Hubbard Company, of Plainfield, New Jersey, or even the W. Henry Rogers Company, of Plainfield, New Jersey. These names would have been, at least to a degree, distinguishing; but in view of the repeated litigations over the word, they might even then have expected litigation. *William Rogers* v. *Rogers & Spurr Manufacturing Co., 11 Fed. Rep. 495; R. W. Rogers Co.* v. *William Rogers Manufacturing Co., 70 Fed. Rep. 1017; International Silver Co.* v. *William Rogers Co., 113 Fed. Rep. 526; William G. Rogers Co.* v. *International Silver Co., 118 Fed. Rep. 133.* If the name did not, in itself, in their estimation, possess great value, I cannot imagine why they took it, knowing, as they must have known, that their right to it would be disputed.

But they say, further: "We intended, when we took it, to adopt such precautions in its use as would make it plain that we were not the complainant, and that our goods were not their goods." Why take it at all? Why first create the difficulty and then seek to minimize its effect? But have they succeeded?

They announced that they were "not in the trust." They mentioned the place of their business, "Plainfield," on their boxes, wrappers, placards and letter-heads. They used, in connection with the name "Wm. H. Rogers" a trade mark consisting of a red seal with the letter "R" in white, in the middle of it, and this trade mark (except the color) they stamped on their wares. These precautions, it would seem from the evidence, have been sufficient to distinguish their goods from those of complainant as far as jobbers, and possibly as far as retail dealers are concerned, and so, if there were no other class of persons that might be misled, I would say that notwithstanding the imitation of the name the complainant was not entitled to an injunction—not because the defendant had not acted unwarrantably, but because, taking all defendant's statements together, no false representation was proven. The statements put

out by them, taken as a whole, sufficiently distinguished their ware from that of complainant.

But the case is different when we come to the ultimate purchaser. It was shown that persons of this class would often see nothing but the knives, forks and spoons. The only thing stamped or etched on these is "Wm. H. Rogers," followed by a circle enclosing the letter "R," impressed with more or less distinctness. To such a purchaser the characteristic words would be "William Rogers," and these words might, and in the ordinary course of dealing would, come to him without explanation. The law is well settled that if the manufacturer puts it in the power of the retailer to misrepresent, he is answerable for the probable consequences.

Counsel contended that any fraudulent intent on the part of the defendant was negatived by what they are proved to have thus done. Suppose it was. The gravamen of the action is not fraudulent intent, but false representation. The *suggestio falsi* is to be found in the name stamped upon the ware. It is rendered harmless as to jobbers and dealers, by reason of other information furnished to them; but if this information does not reach the ultimate consumer, then, as to him, the *suggestio falsi* has its full effect.

But it is argued, further, that the trade mark—a seal enclosing the letter "R"—is always stamped upon the ware itself, after the name. I do not think that this and the letter "H" amount to more than unimportant variations. "Similarity, not identity," said Justice Bradley, in *Celluloid Company* v. *Cellonite Company, 32 Fed. Rep. 94,* "is the usual recourse, where one party seeks to benefit himself by the good name of another." And see *Hendriks* v. *Montagu, 17 Ch. Div. 638,* where the corporate names in controversy were "Universal Life Assurance Society" and "Universe Life Assurance Association," and *North Cheshire and Manchester Brewery Co.* v. *Manchester Brewery Co., L. R. App. Cas. 83 (1899).*

The William H. Rogers Corporation should be enjoined from advertising its wares in its corporate name, or in the name "Wm. H. Rogers," or in any name of which the word "Rogers," in

connection with the word "William" (abbreviated or unabbreviated) is part, and from stamping, selling or otherwise disposing of its wares in those names, or any of them.

Whether the corporation should be enjoined from using the word "Rogers" is a different question. The evidence shows that the predecessors of complainant did business under the names "Wm. Rogers," "Wm. Rogers & Son," "Rogers & Bros.," "Wm. Rogers Manufacturing Company," "Rogers & Hamilton," "William Rogers, Jr." They competed with each other and used various marks to distinguish their wares—an anchor, a star, an eagle, a scimitar. They were all New England concerns. One of them (Rogers & Hamilton) had no connection with the original Rogers Brothers. There is, also, at least one other of that name who competes, in some degree, with complainant, and who is doing so, as far as has been adjudicated, rightfully. *Rogers* v. *William Rogers Manufacturing Co., 70 Fed. Rep. 1019; 84 Fed. Rep. 639; 95 Fed. Rep. 1007.*

Now, as I have said, the court, in this class of cases, interferes only to the extent of preventing the defendant company from passing off its goods as complainant's goods. In view of the number of trade names which contain the word "Rogers;" in view of the fact that purchasers must discriminate in buying, for the trade name points, not only to different factories and manufacturers, but to goods of differing grades; in view of the fact that W. H. Rogers now stands in a position different from that which he formerly occupied, he having acquired some degree of skill and experience in the business or in some of its branches—in view of all these facts, it would seem that the corporation should not be enjoined from using the name "Rogers," its president, if made distinctive, whenever used, by the addition "W. Henry," and "Plainfield, N. J.," in connection with its trade mark. I think that the rationale of the decision in *Baker* v. *Baker, 115 Fed. Rep. 297,* warrants this conclusion; and the decision in *William Rogers Manufacturing Co.* v. *Simpson, 54 Conn. 527,* not only warrants it (though I do not agree to some of the *dicta* contained in the opinion), but, on a some-

what different state of facts, goes further than I am disposed to go on the facts of this case.

If it be suggested that the restrictions imposed by a writ in this form will be somewhat severe, it will be remembered that I am not considering the rights of W. H. Rogers as an individual, he being engaged in no business on his own account, and no relief being sought against him, but the rights of a corporation which has, without necessity and willfully, taken a name calculated to deceive the public and to injure the plaintiff.